Case 3:24-mj-00142-MEG   Document 1-1   Filed 02/16/24   Page 1 of 19

United States District Court
District of Connecticut
FILED AT NEW HAVEN

February 16, 20 24

By S. Santos
Deputy Clerk

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH A CELLULAR DEVICE | Case No. 3:24-mj-142 (MEG)<br><br>**Filed Under Seal** |

# AFFIDAVIT

I, Christopher Kiely, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 of the Unites States Code; that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for federal felony offenses. I am a Task Force Officer (TFO) with the Federal Bureau of Investigation (FBI). I have been employed by the FBI since 2021. In conjunction with my assignment as a TFO, I have been employed by the New Britain Police Department since 2009 where I have acted in the capacity of patrol officer, acting detective, and in 2017 was promoted to the rank of detective. My assignments, while acting in a detective capacity, have ranged from street level drug and firearm investigations, wanted persons investigations/arrests, assault and crimes against persons investigations and gang investigations with the focus on higher level drug suppliers and possessors/suppliers of firearms.

2. As a detective with the New Britain Police Department, I have received basic drug investigation training. I have attended FBI-sponsored training focusing on the use of informants and cooperating witnesses. I have also attended additional gang and narcotics trainings sponsored by federal, state and local law enforcement agencies. I have written and executed search warrants that have resulted in the seizure of drugs and evidence of drug

violations. I have executed warrants that have resulted in the seizure of assets acquired with drug proceeds and assets utilized to facilitate drug activities. As federal law enforcement acting in the capacity of a TFO, I have participated in numerous investigations involving the distribution of controlled substances. I have coordinated controlled purchases of drugs utilizing confidential sources and cooperating witnesses. I have coordinated the execution of search and arrest warrants pertaining to individuals involved in the distribution of drugs, firearms and acts of violence to include homicide. I have conducted electronic and physical surveillance of individuals involved in drug distribution, analyzed records documenting the purchase and sale of drugs, and testified before federal grand juries regarding such matters. I have also interviewed admitted drug traffickers, drug users, informants, cooperating defendants, and local, state and federal law enforcement officers regarding the manner in which drug distributors obtain, finance, store, manufacture, transport, and distribute their drugs. I have supervised the activities of informants and cooperating witnesses who have provided information and assistance in the federal prosecution of drug offenders and I have participated in Title III investigations.

3.  I am currently assigned to the FBI's Northern Connecticut Gang Task Force (NCGTF), an FBI sponsored Task Force consisting of officers from the Connecticut State Police, East Hartford Police Department (EHPD), Hartford Police Department (HPD), New Britain Police Department (NBPD), West Hartford Police Department (WHPD) and Connecticut Department of Correction (DOC). Along with other law enforcement agents and officers, I am one of the case agents who have been involved in the investigation that is the subject of this Affidavit, and I am thoroughly familiar with the information contained herein.

4.  Based upon this experience, and through the experience of other agents and Task Force Officers with numerous years of experience, I have also become well versed in the

methods used in narcotics and firearms trafficking, the specific type of language used by narcotics and firearms traffickers, and the unique patterns employed by these individuals and groups engaged in such activities. I have conducted physical, electronic, and wire surveillance. Additionally, I have arrested individuals for various drug and firearms violations and have spoken with a number of law enforcement officers, subjects, and confidential sources concerning the methods and practices of drug and firearm traffickers. As a result of my law enforcement experiences and the experience of other agents and detectives, I have worked with to investigate drug and firearms traffickers, I have found that they rarely speak openly about their narcotics or firearm transactions. Instead, they use coded language to disguise their conversations about their activities and communicate via text messages. I am also aware that cellular telephones provide narcotics and firearms traffickers with mobile access and control over their illegal trade. They often use cellular telephones to communicate with one another in furtherance of their activities via both voice and text message communications. I also know that narcotics and firearms traffickers routinely use false information when registering their cellular telephones and use cellular telephone numbers and cellular telephones for short periods of time. I have also conducted investigations involving the identification of co-conspirators using telephone records and bills, financial records, drug ledgers, photographs, and other documents.

## **REQUEST**

5.    As part of my duties, I am currently participating in an investigation into narcotics trafficking by Wilfredo ORTIZ, a.k.a. "Will," Michael LUISI, a.k.a. "Mike," and others. Based on the facts set forth in this affidavit, there is probable cause to believe, and I do believe, that violations of 21 U.S.C. §§ 841(a)(1) (distribution of narcotics, possession with intent to distribute narcotics); 846 (conspiracy to distribute and possess with intent to distribute narcotics);

3

and 843(b) (use of a communication facility to facilitate a narcotics trafficking felony) (hereafter referred to as the "Target Offenses") have been committed, are being committed, and will be committed by ORTIZ, LUISI, and others.

6. I make this affidavit in support of applications for a search warrant for information associated with the following certain devices assigned call number:

    a) 860-814-5978 (hereafter referred to as "TARGET TELEPHONE-1") believed to be used by ORTIZ[1] and located in the District of Connecticut, the records and information for which are in the custody or control of T-Mobile;

7. T-Mobile (headquartered in Parsippany, New Jersey), (hereafter, "Service Provider") is a provider of wireless communications services. The Service Provider is a provider of electronic communications service, as defined in 18 U.S.C. § 2510(15).

8. The information to be searched is described in the following paragraphs and in Attachment A-1 of the search warrant. This affidavit is also submitted in support of, and serves as, an application for a warrant pursuant to Federal Rule of Criminal Procedure 41 and Sections 18 U.S.C. 2703(c)(1)(A) and 2711(3), authorizing agents to ascertain the physical location of Target Telephone-1 including but not limited to E-911 Phase II data or other precise location information concerning Target Telephone-1, further described in Section I of Attachment B-, (the "Requested Location Information"), for a period of thirty (30) days of the search warrant. Upon receipt of the information described in Section I of and Attachment B-1 of the search warrants to allow government-authorized persons will review the information to locate items described in Section II of Attachment B-1.[2]

---

[1] Law enforcement is waiting for subscriber information pertaining to the phone.

[2] This is the first request for such information.

4

9. Because I am seeking the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), I also make this affidavit in support of an application by the United States of America for an order pursuant to 18 U.S.C §§ 3122 and 3123, authorizing the installation and use of pen registers and trap and trace devices (pen-trap devices) to record, decode, and/or capture dialing, routing, addressing, and signaling information associated with each communication to or from Target Telephone-1.[3]

10. With regard to the aforementioned Pen Register information, this affidavit sets forth a) sufficient information to establish that there are reasonable grounds to believe that the information likely to be obtained by the installation and use of a pen register device or process and a trap-and-trace device or process on Target Telephone-1 is relevant to an ongoing investigation; and, b) sufficiently specific and articulable facts to establish that there are reasonable grounds to believe that the electronic communications records and/or information sought is relevant and material to an ongoing criminal investigation.

11. With respect to the Requested Location Information, for the reasons set forth herein, there is probable cause to believe that the offenses listed below have been committed, are being committed, and will continue to be committed by the user of Target Telephone-1, as described more fully below. Moreover, there is probable cause to believe that the Requested Location Information will constitute or lead to evidence of these offenses, including but not limited to the location and seizure of Target Telephone-1 and the location of places and persons associated with the illegal activities of the user of Target Telephone-1.

---

[3] This is the first request for such information.

12. I am familiar with the facts and circumstances of the investigation as a result of my personal participation in the investigation; from discussions with agents of the FBI and other law enforcement personnel; from information provided by witnesses involved in the investigation; and from my review of records, reports and affidavits relating to the investigation. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another law enforcement officer or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken or whose reports I have read and reviewed. Such statements are among many statements made by others and are stated in substance and in part unless otherwise indicated. The information contained in this affidavit is based on this familiarity, and upon information which I have reviewed and determined to be accurate and reliable. Since this affidavit is being submitted for the limited purpose of the aforementioned authorizations, I have not included each and every act known to me concerning this investigation. I have set forth only the facts that I believe are essential to establish the foundation necessary to support the issuance of the requested court orders.

## PROBABLE CAUSE

### A. Overview

13. The NCGTF is investigating narcotics trafficking by ORTIZ, a.k.a. "Will" and MICHAEL LUISI, a.k.a. "Mike." Since initiating the investigation in approximately December 2023, I and other NCGTF members have developed evidence that ORTIZ, LUISI, and their associates distribute substantial quantities of cocaine throughout the greater Hartford and Waterbury areas. Investigator have also developed evidence that ORTIZ sells larger amounts of cocaine for LUISI who obtains the cocaine from a source not yet determined.

14. During January 2024, CS-1[4] reported information regarding a business that LUISI owned, "Supreme Automotive," which is located at 494 South Main Street in New Britain, Connecticut. CS-1 stated that the owner of the business, a white male named "Mike" (LUISI) who acts like he is in the mafia, has access to kilogram amounts of cocaine and stores those amounts at his various car dealerships. CS-1 stated "Supreme Automotive" is one of "Mike's" businesses and that is the location where his main office is located. CS-1 believes that Mike stores most of his cocaine on the second floor of "Supreme Automotive," which is only accessible by his close associates.

15. CS-1 stated that around October 2023, he/she was approached by "Mike" and one of the general managers named WILFREDO ORTIZ a.k.a. "Will," and that he ["Will"] offered to sell CS-1 a kilogram of cocaine. CS-1 declined to purchase the cocaine but believes the offer evidenced that "Mike" and "Will'" are selling kilogram amounts of cocaine from the New Britain location. CS-1 further stated that in January 2023, he/she personally observed "Mike" using cocaine at the business and was told by "Will" that "Mike" has access to "tons of it," referring to cocaine.

---

[4] CS-1 is a confidential informant who has been monetarily compensated for his/her cooperation with the FBI. CS-1 has multiple prior convictions for Failure to Appear, Larceny, Criminal Trespass, Assault, Probation Violence, Resisting, Criminal Mischief, Breach of Peace, Sale of Narcotics, Possession of Narcotics, Threatening, and Strangulation. The information provided by CS-1 has been accurate and has been corroborated in part by independent information obtained by investigators in the current investigation. To my knowledge, CS-1 has not knowingly provided any false information. The information provided by CS-1 has been proven to the reliable and trustworthy. As a result, law enforcement has deemed the information that CS-1 had provided associated with the subjects to be reliable.

16.     CS-1 stated that "Mike" owns multiple car dealerships and recently purchased another location located at 37 Chase Avenue, Waterbury, Connecticut, "Supreme Automotive II." CS-1 said "Mike" is having "Will" and unknown associates of "Will" sell cocaine for him at both locations and that "Mike" is then receiving the drug proceeds back and using those proceeds to purchase used vehicles to be sold at "Supreme Automotive" and "Supreme Automotive II." CS-1 provided the phone number 860-814-5978 for "Will" and 860-794-1086 for "Mike."

**B. Controlled Purchase**

17.     During the week ending on February 10, 2024, investigators met with CS-2[5] and CS-3[6] at a specific location for the purpose of conducting a controlled purchase of cocaine from ORTIZ. The confidential informants (CS-2 and CS-3) and CS-2's vehicle were searched for illegal substances/excess currency with negative results. CS-2 and CS-3, who had been provided

---

[5] CS-2 is a confidential informant, who has not been monetarily compensated for his/her cooperation, except for personal expenses incurred through working with the FBI. CS-2 has multiple prior felony convictions for Burglary in the Third Degree, Assault Personnel, Violation of Protective Order, and Possession with Intent to Distribute Narcotics, CS-2 has multiple prior misdemeanor convictions for Interfering/Resisting, Reckless Endangerment in the Second Degree, Assault in the Third Degree, Probation Violation, Burglary in the Third Degree, Assault in the Third Degree, Possession of a Controlled Substance, Larceny in the Sixth Degree, and others. The information provided by CS-2 has been accurate and has been corroborated in part by independent information obtained by investigators in the current investigation. To my knowledge, CS-2 has not knowingly provided any false information. The information provided by CS-2 has been proven to the reliable and trustworthy. As a result, law enforcement has deemed the information that CS-2 had provided associated with the subjects to be reliable.

[6] CS-3 is a confidential informant, who has been monetarily compensated for his/her cooperation with the FBI. CS-3 has multiple prior convictions for Possession with Intent, Resisting, Harassment, Possession of Narcotics, and Probation Violation. The information provided by CS-3 has been accurate and has been corroborated in part by independent information obtained by investigators in the current investigation. To my knowledge, CS-3 has not knowingly provided any false information. The information provided by CS-3 has been proven to the reliable and trustworthy. As a result, law enforcement has deemed the information that CS-3 had provided associated with the subjects to be reliable.

8

pictures and the names for LUISI and ORTIZ previously, were instructed to go directly to "Supreme Automotive" located at 494 South Main Street in New Britain and purchase cocaine as well as to obtain a phone number from either LUISI or ORTIZ to utilize in future cocaine purchases. CS-2 was provided pre-recorded funds. CS-2 and CS-3 were provided audio/video recording equipment, which can be remotely monitored by investigators in almost real time and deployed to the business with investigators following them directly to the business without making any stops or detours. Investigators attempted to set up in positions of covert physical surveillance, however, the field of view was extremely limited.

18. Via the remote audio recordings, CS-2 and CS-3 were heard meeting with ORTIZ. CS-2 and ORTIZ conversed in Spanish. Conversation consistent with a narcotics transaction was overheard and monitored by a law enforcement officer who is fluent in Spanish. After the conclusion of the drug transaction, ORTIZ was heard explaining that if CS-2 wanted to purchase large amounts of cocaine, the price would decrease with every 100 grams that CS-2 purchased. ORTIZ was heard providing CS-2 with his phone number, 860-814-5978 (Target Telephone-1). CS-2 and CS-3 then left the business and returned directly to the pre-determined meet location followed by investigators without making any stop or detours and the audio/video recording was deactivated. CS-2 provided investigators with a plastic bag of suspected cocaine, CS-2 and CS-3 were searched for other illegal substances/excess currency with negative results.

19. During CS-2's debrief, CS-2 informed law enforcement that CS-2 had mistakenly given all of the prerecorded funds to ORTIZ during the controlled purchase. CS-2 was directed, in the presence of investigators, to call Target Telephone-1 and inform ORTIZ of the mistake. CS-2 did as instructed. The phone call went to voicemail and investigators heard that the voicemail box had the identifying name of "Wilfredo Ortiz." A moment later, CS-2 received a

9

phone call back from Target Telephone-1. CS-2 and ORTIZ conversed telephonically, and CS-2 advised ORTIZ he/she overpaid. ORTIZ said CS-2 could come get the excess currency. CS-2, using coded language, told ORTIZ to take the extra currency off of the work ORTIZ was going to do on his/her car when CS-2 dropped it off. ORTIZ agreed.

20. Law enforcement retained the cocaine purchased from ORTIZ via the controlled purchase. It was field tested and returned indicated a positive reaction for "Cocaine HCL" and found to have an approximate gross weight of 29 grams.[7]

### E-911 Phase II / GPS Location Data

21. I know that some providers of cellular telephone service have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the Service Provider's cell towers. As discussed above, cell-site data identifies the "cell towers" (*i.e.*, antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (*i.e.*, faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

---

[7] Lab analysis is pending.

10

22.     Based on my training and experience, I know that the Service Providers can collect E-911 Phase II data about the location of Target Telephone-1, including by initiating a signal to determine the location of Target Telephone-1 on the Service Provider's network or with such other reference points as may be reasonably available.

### Pen-Trap Data

23.     Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number (ESN), a Mobile Electronic Identity Number (MEIN), a Mobile Identification Number (MIN), a Subscriber Identity Module (SIM), a Mobile Subscriber Integrated Services Digital Network Number (MSISDN), an International Mobile Subscriber Identifier (IMSI), or an International Mobile Equipment Identity (IMEI). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

### Subscriber Information

24.     Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent

or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify Target Telephone-1 user or users and may assist in the identification of co-conspirators and/or victims

## AUTHORIZATION REQUEST

25. Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

26. I further request that the Court direct the Service Providers to disclose to the government any information described in Section I of Attachment B-1 that is within its possession, custody, or control.

27. I also request that the Court direct the Service Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B-1 unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of Target Telephone-1 on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The FBI shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

28. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of Target

Telephone-1 would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B-1, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2). I further request the last 60 days of historical cell site data.

29. Because the warrant will be served on the Service Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate Target Telephone-1 outside of daytime hours.

Respectfully submitted,

_____
CHRISTOPHER KIELY
Task Force Officer, FBI

Subscribed and sworn before me on February 16, 2024

_____
HON. MARIA E. GARCIA
UNITED STATES MAGISTRATE JUDGE

13

## ATTACHMENT A-1

### Property to Be Searched

1. The cellular telephone assigned call number **860-814-5978** (TARGET TELEPHONE-1), whose wireless Service Provider is T-Mobile (the "Service Provider") a wireless communications Service Provider that is headquartered in Parsippany, New Jersey.

2. Information about the location of Target Telephone-1 that is within the possession, custody, or control of the Service Provider, including information about the location of the cellular telephone if it is subsequently assigned a different call number.

## ATTACHMENT B-1

## Particular Things to be Seized

**I. Information to be Disclosed by the Service Provider:**

To the extent that the information described in Attachment A-1 is within the possession, custody, or control of the Service Provider, including any information that has been deleted but is still available to the Service Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A-1:

    a. ***Historical and Subscriber Information*** - To the extent that the information described in Attachment A-1 is within the possession, custody, or control of the Service Provider, including any information that has been deleted but is still available to the Service Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A-1 for the time period **February 01, 2024 to DATE OF WARRANT AUTHORIZATION**:

        i. Names (including subscriber names, user names, and screen names);

        ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii. Local and long distance telephone connection records;

        iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v. Length of service (including start date) and types of service utilized;

        vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

    vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

    viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

    ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by Target Telephone-1, including:

    (A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records, email addresses, and IP addresses); and

    (ii) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received), as well as Real Time Tool data (also known as "RTT").

b. ***Historical Call/Text/Data Detail Records with Location Information*** - All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

    i. The date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

    ii. All historical location information, including data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received. Information regarding the cell tower and antenna face (also known as sectors) through the communications sent and received for the time period of **February 01, 2024, to DATE OF WARRANT AUTHORIZATION.**

c. ***Specialized Location Records*** - All call, text, and data connection session location information, related to all specialized carrier records that may be referred to as NELOS (Network Event Location System), LOCDBOR (Location Database of Record), RTT (Real Time Tool), PCMD (Per Call Measurement Data), TDOA or Timing Advance Information (also known as TrueCall), Mediation Records, E9-1-1, and/or Historical GPS/Mobile Locate Information which shows GPS location (longitude and latitude) and Cell-Site and Sector of the device in relationship to the network when connected to the network with the identified mobile number account, from **February 01, 2024, to DATE OF WARRANT**

3

**AUTHORIZATION.**

d. ***Prospective Location Information*** - The Service Provider shall provide all prospective location information about the location of Target Telephone-1**S** described in Attachment A-1 for a period of **thirty days**, during all times of day and night. "Information about the location of Target Telephone-1" includes all available E-911 Phase II data, GPS data, latitude- longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A-1. To the extent that the location information is within the possession, custody, or control of Service Provider, Service Provider is required to disclose the Location Information to the government. In addition, Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information . unobtrusively and with a minimum of interference with Service Provider's services, including by initiating a signal to determine the location of Target Telephone-1 on Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The Service Provider is required to provide the following records associated with **TARGET TELEPHONE-1**; NELOS (Network Event Location System), LOCDBOR (Location Database of Record), RTT (Real Time Tool), PCMD (Per Call Measurement Data), TDOA or Timing Advance Information (also known as TrueCall);

  i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of Target Telephone-1 on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

  ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

e. ***Prospective Pen-Trap Information*** - Pursuant to 18 U.S.C. § 3123, the FBI may install and use pen-trap devices to record, decode, and/or capture dialing, routing,

4

addressing, and signaling information associated with each communication to or from Target Telephone-1 identified in Attachment A-1, including the date, time, and duration of the communication, and the following, without geographic limit:

1. IP addresses associated with the cell phone device or devices used to send or receive electronic communications
2. Identity of accounts that are linked by creation IP address, recovery email, telephone number, or other identifiers
3. Identity of all accounts that are linked to the account by cookies
4. Any unique identifiers associated with the cell phone device or devices used to make and receive calls with Target Telephone-1, or to send or receive other electronic communications, including the ESN, MEIN, IMSI, IMEI, SIM, MSISDN, or MIN
5. IP addresses of any websites or other servers to which the cell phone device or devices connected
6. Source and destination telephone numbers and email addresses
7. "Post-cut-through dialed digits," which are digits dialed after the initial call set up is completed, subject to the limitations of 18 U.S.C. § 3121(c)

Pursuant to 18 U.S.C. § 3123(c)(1), the use and installation of the foregoing is authorized for **thirty days** from the date of this Order. Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Service Provider's services, including by initiating a signal to determine the location of Target Telephone-1 on Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

**II. Information to be Seized by the Government:**

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution of narcotics, possession with intent to distribute narcotics); 846 (conspiracy to distribute and possess with intent to distribute narcotics); and 843(b) (use of a communication facility to facilitate a narcotics trafficking felony) (hereafter referred to as the "Target Offenses") have been committed, are

5

being committed, and will be committed by Wilfredo ORTIZ, a.k.a. "Will," Michael LUISI, a.k.a. "Mike," and others.